Good morning, aloha, and welcome to the Ninth Circuit with my colleagues, Judge Graver and Judge Clifton. We are delighted to be here in Las Vegas. We have four cases on the calendar that were submitted without argument, Terrazas-Morales v. Garland, Corral v. Garland, Garcia-Santiago v. Garland, and United States v. Scruggs. Both are all submitted. We have two cases on the argument calendar, which we will take in the order in which they appear on the calendar. The first case, Mansingh v. United States. Both counsel are appearing by video. So what I just want to make sure of is we're all set with our system. Mr. Pace, can you hear us? Yes, Your Honor. And is it Mr. Axe? That's correct, Your Honor. I can hear you fine, thank you. All right. So counsel, set for 15 minutes aside whenever you're ready. Thank you, Your Honor. I'd like to reserve three minutes of my time for rebuttal. This action arises out of a campaign by U.S. probation officers to harass Mr. Mansingh, first by searching his house under manufactured pretenses, and then initiating and maintaining a prosecution over several years on the basis of evidence that was planted during that search. In dismissing most of the claims on timeliness grounds, the lower court misread the Supreme Court's holding in Wallace and McDonough. McDonough held that when divining the accrual date for a claim, you look to the closest common law analogy, and where that claim rests on the improper initiation and maintenance of criminal proceedings, the closest analogy for accrual purposes is malicious prosecution, which does not accrue until a favorable termination. With the exception of the first three clauses of action, all of plaintiff's claims represent in different forms challenges to the initiation and maintenance of criminal proceedings and therefore fall within McDonough. Counsel, I have a couple of questions related to that. With respect to Claim 16, which is the negligence claim, it appears that that claim encompasses both the original search and seizure and the prosecution, which really are perhaps separate individuals involved in separate times. Is it your contention that the entire thing is timely, or only the portion that deals with the commencement of the prosecution? So our contention is that all of it is timely. And here's why. Essentially, you have two buckets of claims. You have those claims whose closest common law analogy is malicious prosecution, and then you have the bucket of claims that are based entirely on the search. And then you have these two claims, the IED claim and the negligence claim, that sort of straddle both buckets. To the extent that the IED claim is based on the initiation and maintenance of criminal prosecution on the basis of the evidence that was fabricated by the probation officers, we think that's timely under the clear holding of McDonough, because it's closest to common law analogy. But I didn't ask about that claim. I asked about the negligence claim. I'm sorry, Your Honor, you broke up. I asked only about the negligence claim. Count 16. Count 16. I believe that's the one. Count 16, for example, says in paragraph 286, subject to a duty of care to avoid causing unnecessary physical harm and distress through their use of force. So why wouldn't that claim be time barred, even if parts of claim 16 aren't? So to the extent the claim is based just on the use of force while the search was being conducted, we agree that that would be time barred under Wallace. However, to the extent the claim is based on the search of the premises based on false or hack in McDonough, again, not because the closest common law analogy is malicious prosecution, but because to prevail on those claims would mean suppressing the sole evidence underlying the criminal proceedings. Except that seems to me to conflate the claim itself with the evidence that's available to prove a claim. In other words, if the prosecution is wrongful, you can produce any, and that claim is timely, you can produce any evidence that you have to demonstrate that it was improper and that the prosecutors knew it. But that seems to me different than basing the actual claim on earlier events that were concluded, that is, the search and the seizure. Well, I think the question, Your Honor, is under hack in all of the cases that have interpreted hack even after Wallace had said, that where you have a claim that would impugn the very trial process itself, it's subject to hack. Because otherwise, and McDonough lays out all of the pragmatic considerations, otherwise you would require a plaintiff to, sorry, a criminal defendant to file a parallel proceeding and McDonough rejected a rule that would require a plaintiff to file a parallel. But under the FTCA, you can't have claims based on intentional torts, right? Under the FTCA, you can have a claim that's based on, there's an exception where a claim can be based on intentional torts so long as it was conducted by a law enforcement officer. I believe that's section 2689. And there's, I think there's little debate here that the probation officers would constitute law enforcement. And what about the prosecutor? Is the prosecutor a law enforcement officer under the FTCA? I'm sorry, Your Honor. The questions seem to be breaking up. Is the prosecutor a law enforcement officer for purposes of the statute? I apologize, Your Honor. I couldn't, the first part of the question was breaking up. I'll pass. I don't know what the problem is. So I, can you hear me? Judge Graber asked for purposes of the FTCA exception, are prosecutors law enforcement officers? No, Your Honor. The prosecutors would not be law enforcement officers and the prosecutor in this case was not listed as a defendant. All of the claims would adhere against the probation officers. So if I may, I also think there's an important distinction between Wallace and McDonough. What McDonough said was, the difference in Wallace, it said this on page 2159, is that a false arrest claim has a life that's independent of an ongoing trial or a putative future conviction, whereas McDonough's claim centered on the evidence that was used to secure the indictment and does not require speculation about whether charges will be brought. Now here, the plaintiff's search claims likewise centered on the admissibility of the sole evidence that was used to secure the indictment and they therefore represented a frontal attack on the very validity of those criminal proceedings. Now with my, I'd like to pivot for a moment. Can you hear me now? Yes, now I can hear you, Your Honor. I also have a question about Claim 5. Did your predecessor counsel raise the argument in the district court that Claim 5, which is the due process claim, did not accrue until the end of the detention? Your Honor, I can't recall off the top of my head whether the, I assume you're referring to the Manuel case that we cited in the reply brief. I can't remember off the top of my head whether or not that particular issue was raised in the district court. However, the court would not need to rely on that because under McDonough, to the extent that, that claim is a detention without probable cause, which again, the essence, it can be distilled to a challenge to the initiation and maintenance of criminal proceedings and therefore I think the clearest way of conceptualizing that claim is under the McDonough, is under the McDonough framework. But why wouldn't it be appropriate to view it as the beginning of the detention since at that moment he was, in his view, unlawfully detained from the beginning? Because Your Honor, at that point, the detention without probable cause, obviously the two elements are detention and the absence of probable cause, those overlap with the elements that McDonough said were crucial in assessing what the clearest common law analogy would be. Again, because it's a different way of challenging the maintenance of the initiation and the maintenance of the criminal proceedings pursuant to which he was detained. If I may address a few points on the Bivens issue, the government's primary contention here is not that special factors counsel against extending Bivens to the substance of Mr. Manansingh's claim, instead their argument is that probation officers as a class can never be subject to Bivens. And that extreme position finds no support even under Abbasi and Egbert. Under the Supreme Court's ruling in Egbert, the sole question is who is better equipped to assess the consequences of extending Bivens? Is it Congress or is it the courts? And I think this case represents one of the truly exceptional instances in which courts are better equipped to conduct that assessment. In fact, I think the government in its own briefing inadvertently lays out all the reasons why this is the case. Probation officers are judicial employees. They work hand in glove with the judge to enforce court imposed conditions of release. They're protected by judicially crafted immunity doctrines. In the typical Bivens case, and I think every other Bivens case, the concern has been about judicial interference with executive functions. Here it's actually the opposite. I think it would be more accurate to say that if Congress were to craft a judicial remedy, or sorry, were to craft a civil remedy for probation officers, it would be more of an interference in the judicial function than the other way around. And what would be your best Supreme Court case supporting that we should extend Bivens in this context? I actually think somewhat counterintuitively, I think Egbert might be our best case because Egbert says that the only question that you ask anymore is which branch is in a better position to assess the consequences. And I think that because this is the only Bivens case I'm aware of in which the defendants were judicial employees nested within the judiciary and not the executive branch, I think that analysis counsels in favor of an extension. And would there be any difference in your view between the judiciary acting in its capacity as a trial adjudicator as opposed to the judiciary acting in its capacity as an administrator for Bivens purposes? Are they both the same in your view? I think for purposes, so if you take the test literally and you ask which branch is in the best position to consider the consequences, I think that in this case, the court would be in the best position both in terms of both administratively and adjudicatively. Administratively, I think it's in the best position because they, again, they work hand in glove on a daily basis with the probation officers. I think that from an administrative standpoint, I think part of that answer comes from this court's decision in Lanuza v. Love, which postdated the bossy and which was referenced in the district court opinion, and there the court recognized that unlike, say, an executive use of force claim, a prosecution that's based on fabricated evidence threatens the credibility of the judicial system, and I quote, there are few persons better equipped to weigh the cost of compromised adjudicative proceedings than those who are entrusted with protecting their integrity, namely the courts. So I think the answer to your question is on both dimensions, the courts are uniquely better suited to assess the consequences of extending a Bivens remedy to probation officers as a class of individuals. Did you want to reserve the remainder for your time? Yes, Your Honor. All right. Thank you. And Your Honor, may it please the court, I am Assistant United States Attorney Jason Axe representing both the United States and the individual defendants in this case. I'd like to begin by immediately responding to my opposing counsel's reference to the question that he poses to the court, which is whether, which branch is better suited to weigh the costs and benefits. I start with a question the Supreme Court actually posed in Egbert, which is, is there any rational reason, even one, to think that Congress is better suited to weigh the costs and benefits of allowing a damages action to proceed? Question is not which branch posed by the Supreme Court, but whether Congress is better suited. Egbert reminds us that creating a cause of action is a legislative endeavor. Congress considers factors such as economic and governmental concerns, administrative costs, and the impact on governmental operations system-wide in evaluating whether a cause of action is appropriate. Egbert also instructs that the Bivens inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action. That is what appellants have asked this court to do. Instead, answering broadly, as instructed by Egbert, a court must ask whether there is any reason to think judicial intrusion into a given field might be harmful or inappropriate, or whether there is a potential for such consequences. So the Supreme Court has framed a two-step inquiry, but as the court, I'm sure, is aware in Egbert, the single question is whether there's any reason to think Congress might be better equipped to create a damage-as-remedy. Turning to the first step of the two-step inquiry, the appellants have conceded that this is a new context, so we turn to special factors. Now, the briefing in this case occurred prior to Egbert. In our 28-J letter, we referenced a new case that didn't expand on the argument, but the court is free to undertake its own analysis based on the guidance from Egbert. So are there special factors indicating that the judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damage-as-action to proceed? I'll first start with this issue of system-wide consequences. Egbert instructs that even in a particular case, a court likely cannot predict the system-wide consequences of recognizing a cause of action under Bivens. As a result, that uncertainty alone is a special factor that forecloses relief. Recently, in this court's Mejia decision, which was amended on March 2nd, it still noted that with respect to claims against BLM officers, there would be system-wide consequences for BLM's mandate to maintain order on federal lands. Uncertainty about those consequences provided a reason not to imply such a cause of action. Mejia also noted, rarely, if ever, is the judiciary equally suited as Congress to extend and concluded, in all but the most unusual circumstances, prescribing a cause of action as a job for Congress, not the courts. I'll note there are several cases, one in the Ninth Circuit, Smith-Garcia, which we referenced in our 20HA letter, where claims against probation officers were not permitted under Bivens. And post-Egbert, there's a district court case in Colorado that assessed the question about what would be one of the system-wide consequences if claims against probation officers were allowed. Wilson v. Boucher said that under the threat of liability, probation officers may be hindered in carrying out their duties. The question of determining whether a claim should be allowed under those circumstances is one for Congress, not for the courts. The second special factor is Congress's silence in this area. Numerous courts have found that when Congress has not acted in an area, that it's not for the courts to create a statute, a Bivens-type remedy. The third issue is whether there's an alternate remedial structure. Now, by my count, at least 16 district court cases post-Egbert have found that the Federal Tort Claims Act is an adequate alternate remedial structure that this court must consider in determining whether a Bivens-type remedy should be created. Now this court in Mejia recently had language regarding that, took that sentence out, but at the same time, the language that was taken out was while her FTCA claims are based on a legal theory, in Mejia's instance, they are an alternative avenue to seek damages for the injuries alleged in her Bivens claim. And to date, we're not aware of any circuit court cases other than the Fifth Circuit in Oliva v. Nivar, which found that the FTCA is an adequate alternate remedy. But as I said, district courts post-Egbert analyzing this question have come to the conclusion that the Federal Tort Claims Act is an adequate remedy. So for those reasons, the contention of the appellees is that none of the Bivens claims should be permitted because this court should not imply, should not create a cause of action. If there weren't any further questions about the Bivens claims, I can proceed to some of the other points I have. Okay. Thank you. I want to also note for the court that with respect to the issue of fabrication of evidence, the fabrication of evidence claim remains at the district court level. What happened below was there was an initial motion to dismiss filed. Most of the claims were dismissed. The fabrication of evidence claim was not dismissed. It remains. And the plaintiff was given an opportunity to amend his complaint to adequately allege an intentional affliction of emotional distress claim. That's the second amended complaint. After filing the second amended complaint, another motion to dismiss was filed, and the court identified three potential portions of the IIED claim that potentially could be timely and dismissed those on other grounds. The remainder of it was dismissed as untimely. So what seems to have happened in this case is that the plaintiff has initially, the plaintiffs has a 55-page, 275-paragraph, 16 cause of action that he described as a gish gallop, which the court described as a debate practice that involves setting forth an excessive number of arguments to try to overwhelm an opponent. The defendants below filed motions to dismiss. The court issued its comprehensive order. There was an opening brief in this case that raised certain issues that we responded to in our answering brief. In the reply brief, a number of other issues seem to have been raised. And I'll note, as the court is well aware, that generally speaking, the court doesn't consider matters not specifically and distinctly raised and argued in the opening brief or arguments and allegations raised for the first time in the appeal. Probably accounted for by new counsel. I mean, it's a different lawyer currently representing the plaintiff than was representing at the time of the opening brief. That is true, Your Honor. And I think he's, at this point, the fourth attorney who is representing him. And so we're happy to address any of the additional points that have been raised. I also want to note that, with respect to this case, the issue of the fabrication of evidence and the planting of evidence was never raised by the Menansings during their efforts to try to file a motion to suppress. The motion to suppress was based on claims that the search itself was infirm because the probation officers lacked reasonable suspicion. Now, the way that the search was authorized is that the probation officers presented evidence to the chief probation officer, questions about his failing in a drug test, but not an issue in this appeal, and questions regarding whether his finances that they were aware of were in conflict with the fact that he hadn't paid some of the restitution. So a search was authorized. During the course of the search, they identified ammunition that they found. Based on the finding of the ammunition, there was a prosecution that was initiated. At no point during the effort to try to suppress the search was the issue of fabrication of evidence raised. It's only in this lawsuit, subsequently, that— A trial argument. How does that help you here? No, I'm only giving you the background to let you know that that issue still remains at the district court. So to the extent that there are duplicate claims—and I thank you for your question, Your Honor—to the extent that there are claims that are duplicative of the fabrication of evidence claim, the fabrication of evidence claim remains. Your Honors, unless there are additional questions, I will submit on the brief that we have filed. I don't have any. No, thank you, Counsel. You have some rebuttal time. Thank you, Your Honor. Thank you, Your Honor. I'd just like to go through several of the arguments that were raised by the government on the Bivens issue. The government says that extension of Bivens would interfere with probation officers and it warrants of system-wide consequences. It never explains what those consequences would be, and its briefing undermines that very point by noting that probation officers, unlike executive officers, are shielded by absolute immunity when carrying out a vast majority of their functions, something which would not change if Bivens were to be extended and something which distinguishes this class of defendants against every other defendant in a Bivens case to date. I have a question based on the final comments of the defense counsel, and that is, there is a live claim in the district court. What is different about the potential remedies that your client could receive were he successful at trial? What is different between that claim and the various claims that you're trying to revive here? Well, in terms of the remedies, I'm not sure that there is a whole lot of difference in what the ultimate award would be. The elements of the cause of action do differ in some respects. For example, a malicious prosecution claim requires the absence of probable cause. A fabrication claim would not, nor would an abuse of process claim. But I think what troubles me is that the government is now advancing this argument that Bivens can never be extended. The one surviving claim below is the fabrication of evidence, which was a Bivens claim, and now the government is advancing an argument that would preclude even that Bivens claim. They don't formally seek reversal of that part of the order, but they're advancing an argument that would necessitate it. Well, I mean, counsel, it's not that to the extent they are advancing that argument, they're advancing it out of whole cloth. They're advancing it based on what the Supreme Court of the United States has said. I absolutely agree with that, and I think, again, even under the Supreme Court's test, I think a Bivens extension is appropriate in this case. They mentioned the FTCA, for example, as an alternative remedy. The Supreme Court has already spoken to that issue, first in Carlson, then 21 years later in Malesko, in which the court said that Congress intended the FTCA and Bivens to exist as complementary remedies. Both of those cases are good law. Neither one of them was revisited in Egbert. And again, when Congress amended the Westfall Act in 1988, it did so against the backdrop of a much more extensive interpretation of Bivens. But I think, actually, the existence of an FTCA cognate for all of the constitutional claims cuts against the government in this case, because it all but guarantees that there will be litigation against the probation officers. They'll be subject to the same discovery requests, the same depositions, whether Bivens is extended or not. And the final point that I would make is they say, look, they asked this court to infer from congressional inaction that Congress didn't intend to extend a Bivens remedy. But the court addressed that very question in Lanuza v. Love, and it said, look, in that case, this court extended a Bivens remedy to immigration prosecutors who fabricated evidence. And they said the reason Congress didn't extend a remedy previously was probably just because it had never come to Congress's attention. The same is true. Counsel, do you have a closing point? No, Your Honor. Thank you. All right. We thank counsel for their arguments. And the case just argued is submitted. And we move to.
judges: GRABER, CLIFTON, BENNETT